O. H. MOBERLY, Finance Commissioner, and T. J. HALEY, Special Deputy Finance Commissioner, in charge of COOK STATION BANK, Appellants, v. P. A. WATSON and LAKE KENDALL.—102 S. W. (2d) 886.

Division One, March 17, 1937.

*Earl E. Roberts* for appellants.

822

*E. W. Bennett* for respondents.

BRADLEY, C.—This is an action to set aside a deed to two parcels of land in Crawford County, aggregating 28.59 acres. The trial court found for defendants and plaintiffs appealed.

It is suggested by defendants (respondents here) that the appeal should be dismissed because "the record is not properly abstracted" and because there was no "extension of time" for filing bill of exceptions. The point on the abstract is that the evidence is not properly set out. Appellants, in a way, state the effect of the evidence, instead of narrating in the first person. Such is not a satisfactory way to abstract the evidence, but we think that the abstract is sufficiently clear to present the questions raised. The bill of exceptions was filed May 24, 1936. Since the enactment (Laws 1911, p. 139) of what is now Section 1009, Revised Statutes 1929 (Mo. Stat. Ann., sec. 1009, p. 1278), it is not necessary, in order to file bill of exceptions, for the court to make an order granting leave to file (Thompson v. Schultz, 222 Mo. App. 268, 296 S. W. 205, l. c. 208 and cases there cited), and under Section 1009, it is sufficient if such bill is filed at any time "before the appellant shall be required by the rules of such appellate courts respectively to serve his abstract of the record." [See, also, Smith et al. v. Ohio Millers' Mut. Fire Ins., Co., 320 Mo. 146, 6 S. W. (2d) 920, l. c. 927.] Appeal in this case was taken October 15, 1933, and in perfecting the appeal, appellants, in lieu of a complete transcript, as provided by Section 1028, Revised Statutes 1929 (Mo. Stat. Ann., sec. 1028, p. 1310), duly filed here a certified copy of the judgment and order granting the appeal, and on September 12, 1936, a copy of abstract

was served on respondents, and thereafter, and on September 30, 1936, abstract was filed here. The cause was set for hearing on our docket for January 16, 1937. Our Rule 11 provides that where an appellant files certified copy of judgment, etc., in lieu of complete transcript "he shall deliver to the respondent a copy of his abstract at least thirty days before the cause is set for hearing, and in like time file ten copies thereof with our clerk." It does not appear that appellants were delinquent, as to time, in any manner.

The Cook Station Bank in Crawford County failed (time not given) and was placed in the hands of the State Finance Commissioner. At the time the bank failed defendant, Watson, owed it certain notes, dates, amount and when due as follows: March 24, 1930, $50, due six months; April 18, 1930, $50, due six months; November 14, 1930, $270, due six months; December 13, 1930, $100, due six months. Defendant signed the $270 and $100 notes as surety for Emory Watson.

October 10, 1931, the bank obtained two judgments on these notes against defendant Watson, aggregating $571.45. We infer from the record that suits on the notes were filed by the commissioner after he took charge. On March 6, 1931, defendant Watson, conveyed the land in question to defendant, Kendall, his daughter, for a recited consideration of one dollar and other valuable considerations.

The petition is on the theory that the conveyance by Watson to his daughter is void as to creditors, and alleges that it was voluntary and without consideration and was made "for the purpose of hindering, delaying and defrauding creditors" of Watson "of which purpose said defendants were fully cognizant at the time such conveyance was made;" that Watson had no other property out of which the judgments could be satisfied "in whole or in part." Defendants filed separate answers, which are quite similar and, after general denial, set out the claimed consideration for the deed from Watson to his daughter. It does not appear that a reply was filed, but the cause was tried as though such was done.

We make our statement as to the evidence largely from what may be termed respondent's additional abstract. Plaintiffs, appellants here, introduced the record of the judgments of the bank against Watson and used him as a witness. He testified that his wife, the mother of defendant, Kendall, was an invalid and that he "was not able to hire a trained nurse" to take care of her; that his daughter was married and was living with her husband in Iowa; that her husband died in February, 1929; that he attended the funeral in Iowa, and "prevailed upon her to come back and take care" of her mother; that he "hired her to do the work and wait on my wife." The daughter came to her father's home shortly after the death of her husband, and Watson testified that he borrowed $300 from his daughter and gave her a note therefor; that his daughter took care of her mother

and did the house work until March, 1931, "at which time we had a settlement," and that at the settlement it was "agreed that her labor for two years was worth $500 a year, and in consideration of that labor, the cancellation of the $300 note and her agreement to take care of my wife so long as she might live, I conveyed the 25 acre farm, which I owned, to her, together with a small amount of personal property that was on the place." Watson testified further that when he executed the deed, his daughter returned to him "the canceled note" and gave him a receipt "for the services of the past two years;" and that she "then continued the services for an additional two years," until the death of his wife in April, 1933; that he "considered the farm and everything on it worth (at the time of the conveyance) not to exceed $2,000," and that such was, perhaps a little high;" that after he conveyed to his daughter she "took charge of the place."

G. W. Gorman, who had been a merchant in Cook Station for twenty-three years and who owned a farm near the Watson land, testified, as a witness for plaintiffs, that he figured "the Watson land and all the property on it worth (at the time of the conveyance) $2,000.00." It also appears that Watson went from his farm near Cook Station, in Crawford County, to Salem in Dent County, to get a notary to come to his home to take his wife's acknowledgment to the deed, but he said that he did not know that there was a notary at Cook Station. He made no appearance in the note suits by the bank.

The daughter, as a witness in her own behalf, testified that her husband died in Iowa in February, 1929; that her mother was an invalid, and that her mother and father wanted her to come back and take care of the mother; that it was agreed that she "was to be paid for the work, but no amount was agreed upon at that time; that she took care of her mother from the time she returned, until her death in April, 1933; that she got $300 "in a damage suit in connection with her husband's death," and loaned the $300 to her father and took his note therefor; that in March, 1931, she asked for a settlement, and, at that time, "I took over the place and in consideration for the deed, canceled the $300.00 note," and gave her father a receipt for $1000 "for the two years work I had done" and agreed with her father and mother that "I would take care of my mother as long as she lived," and that she did take care of her mother "for two years more until her death in April, 1933." She further testified that by the agreement in March, 1931, she "was to receive $500.00 per year for nursing my mother, doing the cooking and all the housework, and that I was to continue these services on the same basis so long" as the mother lived; that her mother "was bedfast and required constant attention for three or four years before her death;" that when she got the deed, she had it recorded (deed was recorded March 7, 1931), and that since that time she had paid all the taxes on the land

and had full control thereof; that at the time she took the deed she "had no knowledge or information" that her father "was indebted to the Cook Station Bank or anyone else;" that the first information she had of this indebtedness of her father was when he was sued. (Process in the bank suits was served on the father, August 6, 1931.)

Ed White, a witness for defendants, and who had lived near Cook Station and the land involved, for eighteen years, testified that he was acquainted with land values "in that part of the country," and placed the value of the Watson land (at the time of the conveyance) at "something like $1500.00."

█ It is conceded that Watson conveyed to his daughter all his property, including household goods. The personal property that was passed is not in question, except indirectly as it may affect the conveyance of the land. As to what the personal property consisted of, except household goods, or its value, does not appear, but the inference is that its value was not of consequence. In dealings between parent and child, where the rights of creditors are involved, their acts should be closely scrutinized. [Barrett v. Foote (Mo.), 187 S. W. 67, l. c. 70, and cases there cited.] So far as appears here, the daughter had loaned her father the $300 and had performed the services claimed for over a year before the father became indebted to the bank, and if the services were of the reasonable value of $500 per year, then the father owed his daughter some over $800 before he became indebted to the bank. The two $50 notes were dated respectively March 24th and April 18th, 1930, and she began her services, according to the evidence, near March 1, 1929. Thus it appears that the father had the right to prefer his daughter among his creditors to the extent of at least $800, when the deed was executed, even though she had known of the then indebtedness to the bank. [Peoples Bank, by Moberly, Comr., v. Jones et al., 338 Mo. 1048, 93 S. W. (2d) 903.] As stated, the $270 and $100 notes were dated respectively November 14th and December 13th, 1930, and if the services were of the reasonable value of $500 per year, then when the last two notes were given by Watson to the bank, he owed his daughter about $1150. There is no contention that the daughter did not render the services and no attempt was made to show that the services rendered by her were not of the reasonable value of $500 per year. █

In such situations as here, and in many instances, a creditor has no countervailing evidence, except from the circumstances, but there is no presumption of falsehood attaching to the evidence of a parent, son, daughter, husband or wife, when testifying regarding transactions between them. "Fraud can rarely be proved by direct evidence. It is most frequently to be deduced from the circumstances surrounding the transaction and from the acts of the parties. Mere suspicion is not, however, sufficient. The fraud must be proved as an affirmative fact, and the proof must be of such a positive and definite char-

acter as to convince the mind of the chancellor, for it is never presumed, and if the facts shown all consist as well with honesty as with fraud, the transaction should be held honest." [Farmers' Bank v. Worthington et al., 145 Mo. 91, l. c. 100, 46 S. W. 745.] The trial chancellor heard and saw the father and daughter when on the stand and was in much better position to pass upon their credibility than are we.

According to the evidence, the daughter had no information about her father's indebtedness to the bank until August 6, 1931, when process in the note suits was served. At that time she had taken care of her mother and did the household work from, we may say, March 1, 1929, and her father had the $300 for about two years before the conveyance on March 6, 1931. The services to August 6, 1931, over a period of two years and five months, at $500 per year, amounted to $1233. It appears that the note bore interest, but the rate is not given. Assuming that the rate was six per cent from date, then the interest on the note, at the time of the conveyance in question, was around $36. All told, at the time the daughter first knew of her father's indebtedness to the bank, she had invested in the land, approximately $1569. Of this sum, $233 was for services rendered from March 6, 1931, time of conveyance, to August 6, 1931, under the agreement for *future* services.

"If after a conveyance based upon consideration of future support, the grantee in good faith actually furnishes support in an amount equal to or greater than the value of the property conveyed to him, it becomes an executed valid consideration for the conveyance and creditors cannot set it aside." [Oldham v. Wright, 337 Mo. 170, l. c. 175, 85 S. W. (2d) 483, l. c. 485.] The same rule would apply as to future services rendered by the daughter in the present case prior to her knowledge of her father's indebtedness to the bank. In the Oldham case it is said (337 Mo. l. c. 175, 85 S. W. (2d) l. c. 485) that "if the grantee has not acted in good faith, but has participated with the grantor for the purpose of hindering and delaying his creditors, by attempting to put the property beyond their reach when it is in fact held as a secret trust for the grantor, then, even though support has actually been furnished by the grantee, the conveyance is void and the grantee is entitled to have nothing thereby." But there is nothing here to support the theory that the daughter in any way connived with her father to defraud the bank or any one. It further appears in the Oldham case, 337 Mo. l. c., 175, 85 S. W. (2d) l. c. 485, that "if the grantee has acted in good faith, without knowledge of existing indebtedness, and has, after the conveyance, actually furnished support of substantial value, the conveyance is valid to that extent, and, while the conveyance may be set aside, the grantee is entitled to a preference in the property over other creditors to the extent of the support furnished by him."

As appears, one witness in the present case valued the land at $1500. The subject of homestead is mentioned three times in defendants' brief, but such was not pleaded and there is nothing in the evidence, as it appears, to specifically show that the trial court considered the question of homestead. If there was such evidence and the trial court found that the land in question was the father's homestead at the time of the creation of indebtedness to the bank, then there would be no ground to support the contention of plaintiffs that the conveyance to the daughter was fraudulent as to the bank. As stated, the daughter had let her father have $300 and had rendered services from March 1, 1929 to March 24, 1930, before the father became indebted to the bank, so far as appears here, and these services, assuming $500 per year to be reasonable, together with the note, amounted to around $800. To the extent of the homestead, $1500 (Sec. 608, R. S. 1929, Mo. Stat. Ann., sec. 608, p. 4221), the conveyance could not have been fraudulent. [May v. Gibler, 319 Mo. 672, 4 S. W. (2d) 769.] And the same was true as to the personal property to the extent of $300. [Secs. 1160, 1163, R. S. 1929, Mo. Stat. Ann., secs. 1100, 1163, pp. 1422, 1425.]

Under the most favorable view of the evidence, adopting (which we do) the finding of the trial court that there was such contract and services as pleaded, the bank could have no greater interest in the land conveyed than the amount of its judgment liens, subject to the prior claim or preference of the daughter for $1569, and since the evidence as to value was from $1500 to $2000, we do not think we should disturb the finding of the trial chancellor, and remand the cause to be disposed of according to the respective claims as suggested that may be done in the Oldham case.

The judgment should be affirmed and it is so ordered. *Ferguson* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.