Thomas C. **WILLIAMS** et al., Respondents,

v.

**MILLER PONTIAC COMPANY, a Corporation, Appellant.**

No. 24432.

Kansas City Court of Appeals.

Missouri.

Oct. 3, 1966.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 5, 1966.

Donald L. Mason, Mason, Gant & Moran, Kansas City, for appellant.

James N. Cameron and Carl Gangel, Kansas City, for respondents.

MAUGHMER, Commissioner.

This is an action for damages, both actual and punitive, alleged to have been sustained by plaintiffs Thomas C. and Carol Williams, husband and wife, as a result of fraud practiced upon them by defendant Miller Pontiac Company in connection with the sale to them of an automobile.

Early in April, 1963, the plaintiffs, residents of Grandview, Jackson County, Missouri, decided to purchase a new 1963 Pontiac Tempest LeMans hardtop coupe. Pursuant to such plan Mr. Williams went to the Laner Pontiac Company, Kansas City, Missouri, a dealer and distributor of Pontiac automobiles. Plaintiffs at the time owned a 1961 two-door Volvo automobile. Mr. Williams made an agreement with Laner to purchase a new 1963 Tempest Pon-

tiac LeMans hardtop coupe with automatic transmission, bucket seats and a V-8 engine. He testified that the cost of this new automobile was $2750, and by agreement Laner was to allow him $750 for the Volvo. However, Laner was unable to make delivery within less than 30 days. The plaintiffs were eager to get a new car quickly so Mr. Williams, having talked it over with his wife, asked Laner to cancel their agreement. Laner agreed to cancel and suggested that Mr. Williams might find a satisfactory car in stock at Miller Pontiac Company, 42nd and Main Streets, Kansas City, Missouri, the defendant in this lawsuit.

Mr. Williams, on the same day, April 16, 1963, proceeded to the Miller establishment. He had been directed by Laner to there seek out a Mr. Tony Nigro, salesman, who had been telephoned by Laner, and advised that Mr. Williams was coming. Mr. Williams located Mr. Nigro, but he was busy and suggested that Mr. Williams "look around" and also take the Volvo "across the street and have it appraised". Plaintiff went across the street by himself and onto defendant's lot, where he saw numerous automobiles—some inside the building and some outside. On his first "look" plaintiff found no vehicle meeting his requirements, but on his second time around and on the outside of the lot he located a 1963 Tempest LeMans hardtop coupe with automatic transmission. It was just what he wanted and exactly the same as his tentative purchase at Laner, except (1) it was red, which he did not like particularly, and (2) it had power steering, which he regarded as an asset.

Mr. Williams located this automobile by himself without any guidance, direction or suggestion from anyone. He assumed it was a new car although the speedometer indicated it had been driven "between 500 and 600 miles". He said he thought this mileage might have been accumulated through use of the car as a demonstrator. He reported his "find" to Mr. Nigro, who was still busy. Mr. Nigro called Mr. Earl Miller and referred plaintiff to him. Mr. Miller was one

of the owners of Miller Pontiac and at the time was acting general manager.

Mr. Miller and plaintiff went into the company office. The Tempest on Miller's lot, in which Mr. Williams was interested, was identified and Williams inquired if he could get that car for the same price as the one he had ordered from Laner, that is, $2750. Plaintiff testified that Mr. Miller figured on a "scratch pad", agreed on a price of $2750, $850 allowance for the Volvo, and $1900 cash. Mr. Miller wrote up a sales order (Defendant's Exhibit 1) which recited the detailed agreement. Plaintiff signed in four places. In addition to the figures, this sales form had two blocks within which a mark could be placed indicating that the sale was of a new car or a used car. Neither of these blanks was filled or marked. There was no writing on the sales form to indicate whether the automobile was new or was used. The form had another block with the following statement in black type: "If the car sold herein is a used car or a new car with over 100 miles shown on the speedometer then there is no warranty or guarantee as to the exact mileage car has been driven, regardless of mileage shown on the speedometer". Plaintiff signed immediately under this statement.

Mr. Williams conceded that he selected the car by himself; that no one ever told him that it was new and not used, and that he himself suggested the price of $2750, which was the new car price at Laner's (without power steering). Plaintiff also asked Mr. Miller to have the speedometer set back to zero. He said he thought his wife would appreciate the car more if this were done. Mr. Miller said it was done so plaintiff could get a new car warranty. It is conceded and agreed that plaintiffs transferred the Volvo title to the defendant company and paid the agreed-upon cash balance.

On the ensuing week-end Mr. Williams was "washing and cleaning" his new automobile. On the inside of the front door he found an oil and grease sticker, indicating that an oil change had been made at 3400 miles. He also found under the seat a gas purchase receipt issued to a Mr. John T. Hester, whom he later located and identified as the original owner of the automobile.

Plaintiff reported the whole matter to his attorney, who wrote to defendant company about it. Defendant immediately offered to rescind the whole transaction, to return the Volvo and purchase price to plaintiffs and accept return of the Pontiac, but plaintiffs elected, failed or refused to do so. The verdict and judgment were in favor of plaintiffs for $400 actual, and $1,000 punitive damages. The after-trial motions were overruled and this appeal followed.

Defendant says that the court erred in overruling its motion for directed verdict for the reason that plaintiffs did not prove all of the essential elements of fraud. It says that there was no proof (1) of representations or misrepresentations on which plaintiffs relied or had the right to rely; (2) no showing of scienter or intent to deceive and (3) no proof of damage. It says further under this point that for these three reasons just set out it was error to give Instruction No. 3, and that Instruction No. 8, submitting punitive damages, was unauthorized as there was no proof of malice.

Defendant has cited and quoted from opinions which it says sustain the contention that a verdict should have been directed. We believe those authorities not only fail to sustain defendant's position, but lead to an opposite conclusion. Bolten v. Colburn et al., Mo.App., 389 S.W.2d 384, 390, contains the following declarations with which we agree completely:

"Fraud is not to be presumed but must be proved. To satisfy this burden of proof the evidence produced must be clear and convincing. Mitchell v. McClelland, Mo.App., 306 S.W.2d 75; Herrold v. Hart, Mo.Sup., 290 S.W.2d 49. In so saying it is recognized that fraud

can rarely be proved by direct evidence. It is most frequently to be deduced from the circumstances surrounding the transaction, and from the acts of the parties. Mere suspicion is not, however, sufficient. The fraud must be proved as an affirmative fact, and the proof must be of such a positive and definite character as to convince the mind of the chancellor, for it is never presumed and, if the facts shown are consistent as well with honesty as with fraud, the transaction should be held honest. Moberly v. Watson, 340 Mo. 820, 102 S.W.2d 886, 889".

■ The elements of actionable fraud as defined by C.J.S. were adopted and approved by the Supreme Court in Powers v. Shore, Mo., 248 S.W.2d 1, 5. We quote from that opinion:

" 'Comprehensively stated, the elements of actionable fraud consist of: (1) A representation. (2) Its falsity. (3) Its materiality. (4) The speaker's knowledge of its falsity or ignorance of its truth. (5) His intent that it should be acted on by the person and in the manner reasonably contemplated. (6) The hearer's ignorance of its falsity. (7) His reliance on its truth. (8) His right to rely thereon. (9) And his consequent and proximate injury.' 37 C.J.S., Fraud, § 3, page 215".

In Jones v. West Side Buick Auto Co., 231 Mo.App. 187, 93 S.W.2d 1083, 1085, 1086, defendant company turned back the speedometer and argued that such was not a "misrepresentation" and even if it were, nevertheless, it was not "malicious" so as to authorize punitive damages, since the turning back of the speedometer was a common and recognized practice. Both contentions were denied on appeal. We shall quote from this opinion on the "malicious" feature later on and in connection with Instruction No. 8. As to whether or not the mere turning back of the speedometer amounts to a representation, the court said:

"Defendant first argues that the mere turning back of the speedometer could not have constituted a representation; that in the first instance it was but a compliance on defendant's part with a custom of the trade; and that in any event speedometer readings in their very nature are or may be so inaccurate that they are not to be taken as a guide in buying a used car.

"We cannot agree with any of such suggestions. That defendant may have been following a trade custom in turning back the speedometer could not have served to make its act any the less a representation. The sole purpose of manufacturers in equipping automobiles with speedometers which register total mileage is to show at all times the total number of miles that the particular car has gone.

*     *     *     *     *     *

"The only possible reason defendant could have had in turning the speedometer back was to make it appear that the car had been run only the number of miles which the speedometer was made to indicate. We grant that *the record discloses no statement by defendant either oral or written regarding the mileage of the car. However, a representation is not confined to words or positive assertions;* it may consist as well of deeds, acts, or artifices of a nature calculated to mislead another and thereby to allow the fraud-feasor to obtain an undue advantage over him". (Italics ours).

■ In our opinion each of the nine elements of actionable fraud is present in the case before us. The authorities just referred to and reason itself indicate that defendant's agents and representatives, not by affirmative written or oral word, but through silence, by selling a used automobile for a new car price and by turning back the speedometer, made material representations that the vehicle was a new one. Certainly such representations were false— an automobile being sold to a second owner

and with 3400 miles on it is not new. Whether the purchaser was receiving a new car or a used one is clearly material. Defendant's representatives knew the vehicle was used, knew plaintiff was ignorant of this fact and realized he was relying on the truth of the representations. Beyond question a purchaser has the right to rely upon such representations made to him by the dealer. That injury and damage result is not debatable. Instruction No. 3 submitted these essential elements on the issue of fraud. We believe the evidence authorized such submission.

■■ Instruction No. 8 on punitive damages was also properly submitted. For a dealer to induce or allow a purchaser to think he is buying a new car when he is not, certainly shows scienter or intent to deceive. The case of Jones v. Buick, supra, supplies square authority for so ruling. We quote additionally from that opinion (p. 1088):

"Regardless of what the rule may be in other jurisdictions or of the refinements and limitations with which textwriters may see fit to state it, the courts of this state seem now to be committed to the proposition that in cases of fraud and deceit punitive damages may be awarded where legal malice is present. Luikart v. Miller, Mo.Sup., 48 S.W.2d 867; Finke v. Boyer, 331 Mo. 1242, 56 S.W.2d 372. Moreover, by legal malice the courts have in mind simply the accepted theory of the intentional doing of a wrongful act without just cause or excuse, and not the necessity for the showing of any spite or ill will, or that the particular act was willfully or wantonly done".

■■ Mr. John T. Hester, the original owner of the automobile around which the dispute centers, testified that just after he had traded the car to Miller Pontiac, a group of people—three, four or five—were standing around it. He did not know those persons but he thought one was a Miller Pontiac salesman. He said he heard a remark by this man, who was wearing a business suit, to the effect that "We would probably sell the Tempest as a new car". The trial court received this testimony over lengthy and strenuous objections, that there was no showing that the person who made the statement was defendant's agent, it was hearsay and highly prejudicial. Even though we were to conclude that such testimony, standing alone, was inadmissible, still we would be unable to believe that its admission in this case constituted prejudicial and reversible error. It is difficult to understand just how reception of the salesman's oral opinion that defendant company would *probably* sell this particular Tempest "as a new car", could actually materially injure the defense, when the other evidence shows that is *exactly* what the defendant company did do—namely, sell it as a new car. We are admonished by both statute and rules, not to reverse a judgment unless error materially affecting the merits was committed. Sec. 512.160[2], V.A.M.S.; Rule 83.13[b] M.R.C.P., V.A.M.R.

We find no reversible error in the instructions, the evidence presents a submissible case which will support the verdict and judgment. Defendant has suggested no additional error.

The judgment is affirmed.

SPERRY, C., concurs.

PER CURIAM:

The foregoing opinion of MAUGHMER, C., is adopted as the opinion of the Court.

All concur.